897 A.2d 1075

FREDRIC FEIT, M.D., AND MODERN PAIN THERAPY CENTER, INC., A NEW JERSEY CORPORATION, PLAINTIFFS–APPELLANTS, v. HORIZON BLUE CROSS AND BLUE SHIELD OF NEW JERSEY. DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Submitted September 20, 2005—Decided April 28, 2006.

472

Before Judges LEFELT, HOENS and R.B. COLEMAN.

*Edward G. O'Byrne,* attorney for appellants.

*Becker Meisel,* attorneys for respondent (*Daniel J. O'Hern, Jr.,* on the brief).

The opinion of the court was delivered by

R.B. COLEMAN, J.A.D.

Plaintiffs, Fredric Feit, M.D. and Modern Pain Therapy Center, Inc., appeal from the dismissal of their complaint alleging breach of contract, defamation, malicious prosecution and tortious interference. The complaint sought damages for Horizon's termination of Dr. Feit as a participating physician in the Horizon Blue Cross and Blue Shield of New Jersey (Horizon) provider network and for its report of the termination to the New Jersey Board of Medical Examiners (the Board). The trial court dismissed the First Count, the Second Count, the second (erroneously designated) Second Count, the Third Count and the Sixth Count of plaintiff's complaint. As to those counts asserting tort claims, the court ruled that Horizon is immune pursuant to *N.J.S.A.* 45:9–19.1 because it did not act with malice and it had a good faith basis to notify the Board of the termination. We affirm that basis for dismissing the tort claims, but we reverse the court's dismissal of the Fourth and Fifth Counts of plaintiffs' complaint, to the extent they seek compensatory damages for the alleged breach of the provider contract. The trial court held these claims were federally preempted by the Employee Retirement Income Security Act (ERISA), 29 *U.S.C.A.* § 1001 *et seq.* We disagree and conclude that the doctor is entitled to adjudicate his contract-based claims for wrongful termination of the provider contract and for payment for services rendered under that provider contract prior to its termination. We reverse and remand for that purpose.

On September 22, 1994, plaintiff Fredric Feit, M.D., signed a provider contract with defendant Horizon entitled "Agreement with Participating Physicians and Providers." By the terms of that agreement, Feit became a participating physician in Horizon's provider network, a capacity in which he continued until May 24, 2002. As a result, Feit received direct payment from Horizon for health care services he provided to its subscribers in the area of his specialty, rehabilitation and pain management. Pursuant to paragraph six of the agreement, either party could cancel the contract by giving thirty days' written notice.

The agreement provided that Feit would allow Horizon "to review and copy patients' records in [his] office during regular business hours." In furtherance of that provision and authorization, in October 1998, Horizon's Utilization Review Department (UR Department) conducted a review of Feit's practice in Freehold, Modern Pain Therapy Center, Inc. During its review, Horizon analyzed medical records and claims for services Feit rendered from January 1, 1997 through June 30, 1998. As a result of its analysis, on October 15, 1998, the UR Department determined, in relevant part, that Feit's medical records "lack[ed] documentation to support the complexity of the patient evaluation and management codes billed." It further observed that while "patients [were] seen for a prolonged period of time there [were] no documented treatment plan[s]." Horizon concluded that "the medical records reviewed are lacking adequate documentation to support reimbursement and do not meet the standard of care of the practicing community." While it did not seek a refund for any prior inadequately documented claims, Horizon informed Feit that it would be reviewing his claims on a prepayment basis.

In December 1999, Horizon's UR Department referred the medical records of two of Feit's patients to its Medical Advisor's Office as well as to an independent board certified pain management consultant. These reviewers opined that the documented treatment that those patients received during this time was "not medically appropriate" based, in relevant part, on insufficient

documentation and the absence of a clearly stated treatment plan. Consequently, Horizon did not reimburse Feit for those patients' treatments. The reviewers also questioned the authenticity of the documentation for the two patients, as their medical records were "essentially identical."

Due to its continuing belief that Feit's documentation was inadequate, the UR Department referred Feit to its Special Investigations Unit (SI Unit), which investigates cases of alleged billing fraud and inappropriate medical practices. On May 8, 2000, Vincent C. Ceglia, a member of the SI Unit, sent a letter to Feit, requesting an on-site audit of his patient records. As Feit did not respond, Ceglia wrote to Feit again on May 22, 2000 and on August 1, 2000, informing Feit that he was in breach of his contract. In the August 1, 2000 letter, Ceglia gave Feit notice that any outstanding or future payments would be withheld until Horizon could conduct an on-site audit.

Due to Feit's failure to respond to Horizon's requests to conduct an on-site audit, the matter was referred to Horizon's legal department. On May 2, 2001, Frederic N. Futterman, Horizon's Assistant General Counsel, wrote to Feit, informing him that if he did not contact Horizon within five business days to schedule an on-site audit, Horizon would "proceed with the termination of [Feit's] contract and [his] status as a participating physician." Feit did not respond. So, on July 30, 2001, Horizon's Senior Medical Director, Stanley E. Harris, M.D., informed Feit that Horizon was terminating him as a participating physician, effective August 31, 2001. Horizon gave the following reasons:

> We have decided to exercise our right to terminate the Agreement based upon your breach of its terms, as demonstrated by your failure to cooperate with individuals in our Utilization Management and Investigations Departments to the extent that they have been unable [to] conduct their routine utilization management and audit functions with regard to your practice. Your breach of the Agreement has further manifested itself by these individuals being unable to arrange an on-site audit as well as your failure to present us with copies of various medical records that we require to complete our review and audit tasks despite our repeated requests.

In early August 2001, Feit called Harris regarding the termination letter and expressed a willingness to allow the audit and inquired about his right to contest the termination. In a letter dated August 9, 2001, Harris informed Feit that, although he had no formal appeal rights to contest his termination, he could write a letter to Harris "detailing the circumstances related to your failure to comply and failure to respond to the May 2, 2001 letter." In a letter received by Horizon on September 5, 2001, Feit expressed a desire to allow an on-site audit of his office records.

Horizon suspended its announced termination action for ninety days, provided that Feit would allow it to conduct an on-site audit immediately. Horizon also informed Feit that he would have to submit a recredentialing package before he could be considered for reinstatement as a participating physician.

After conducting the on-site audit, Horizon referred the files of five of Feit's patients to Dr. Clay Miller, M.D., an independent medical examiner affiliated with Core, Inc., who had experience in pain management. In his Peer Review Analysis, dated January 18, 2002, Miller noted that Feit prescribed therapies and treatments that were excessive for pain management. In Miller's opinion, the multiple injections, blocks and physical therapies were "palliative and not restorative and therefore not medically necessary for an ongoing chronic pain that has not responded to 3–months of treatments." Miller commented that Feit's medical records did not support the medical necessity or appropriateness of office visits for which they were billed and that he failed to adequately document reasonable treatment plans. Miller also noted that Feit prescribed several narcotic medications, a practice which was not the industry standard. Miller maintained the industry standard was to use one long-acting narcotic with a short-acting one for breakthrough pain.

Due to the concerns Miller raised in his Peer Review Analysis, the SI Unit referred Feit's alleged practices to Horizon's Quality Case Review Subcommittee (the Review Subcommittee) to determine whether it should pursue a professional competency action

against Feit. After discussing the concerns regarding Feit at its monthly meeting in April 2002, the Review Subcommittee requested written comments from Feit within ten business days concerning his treatment of the five patients upon whom Miller's Peer Review Analysis was based. with its letter to Feit, the Review Subcommittee enclosed a copy of Miller's analysis. Feit did not respond to this request. Hence, at its May 14, 2002 meeting, the Review Subcommittee referred the matter to Horizon's Credentialing Subcommittee with a recommendation to terminate Feit "as an imminent threat to the welfare & safety of [its] members."

A few days later, on May 17, 2002, the Credentialing Subcommittee accepted the Review Subcommittee's recommendation to terminate Feit as a participating physician. The Credentialing Subcommittee indicated Feit would be given ninety days to appeal its decision. Instead, on May 24, 2002, Dr. Ana Baez, M.D., Medical Director and Acting Chairperson of the Credentialing Subcommittee, sent Feit a letter informing him that his provider contract "has been terminated immediately based on the Subcommittee's view that your continued participation presents an imminent danger to the health, safety and welfare of our plan's insured persons." Baez informed Feit that he had thirty days in which to request a hearing. Baez also informed Feit that Horizon's actions would be reported to the New Jersey Board of Medical Examiners pursuant to federal and state law.

Feit responded to Baez by letter, dated June 23, 2002, in which he requested a hearing to contest Horizon's termination of his provider contract. In this letter, Feit listed all of the patients and doctors he intended to call at the hearing. Feit subsequently received a notification to appear at a hearing before the New Jersey State Board of Medical Examiners to "personally discuss the care and treatment of [fifteen named] patients, as well as [Feit's] overall practice of medicine."

On October 16, 2002, Feit testified before a Preliminary Evaluation Committee of the Board. After reviewing that testimony, patient records, and other relevant documents, the Board commu-

nicated its determination that no disciplinary action was warranted at that time:

The Board has determined that although your patient care and treatment fell within acceptable standards, your patient records did not meet the requirements of the Board's record keeping rule, *N.J.A.C.* 13:35–6.5, particularly, with respect to your failure to document vital signs in the patients' medical records. At this time, ... the Board has determined that the facts identified herein do not warrant initiation of a formal disciplinary action if you are willing to undergo the remedial steps set forth in this Letter Agreement:

1. Within six (6) months of the signing of this Agreement you will, at your own expense, enroll in and satisfactorily complete a medical record-keeping course approved in advance by the Board.

2. Proof of such completion shall be provided to the Board within (10) ten days of the completion of the course.

On May 20, 2003, plaintiffs filed their complaint in this action. On July 29, 2004, Horizon moved for summary judgment. In opposition to the motion for summary judgment, plaintiffs presented various proofs, including the certification of Dr. Michel Y. Dubois, M.D., a professor of anesthesiology at New York University Medical School, who opined that "throughout the course of their treatment, the care [plaintiffs] provided ... in no instance constituted an imminent danger to the health, safety and welfare of these patients." Dubois further opined that Miller was "professionally incorrect in stating that treatment with medication and physical therapy becomes 'excessive' when symptoms do not resolve or significantly improve beyond three months of treatment." Rather, "[t]he very purpose of the specialty in Pain Medicine is to treat those who are chronically suffering" and it was therefore "professionally improper to state that after any duration, treatment is excessive." Dubois asserted that "treatment should be continued as long as the patient has pain."

Plaintiffs also presented a January 28, 2004 letter from Marc Kirschenbaum of Physicians' Practice Management Services, Inc., who described his detailed review of Feit's medical records, and reported his conclusion that Horizon owed Feit $817,270.93 for unpaid services Feit had provided to Horizon patients under the terms of his provider agreement.

On appeal, in reviewing a trial court's decision to grant summary judgment, this court uses the same standards as the trial court. *Prudential Prop. Ins. v. Boylan,* 307 *N.J.Super.* 162, 167, 704 *A.*2d 597 (App.Div.), *certif. denied,* 154 *N.J.* 608, 713 *A.*2d 499 (1998) (citations omitted). The court decides whether there was a genuine issue of material fact. *Ibid.* Summary judgment must be granted if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." *R.* 4:46–2(c).

■ Plaintiffs contend the trial court erroneously determined that Horizon enjoys statutory or common law immunity for Feit's claims of defamation, malicious prosecution and tortious interference with a prospective economic advantage. We find that a statute and a regulation were implicated by defendant's motion for summary judgment.

■ The relevant statutory provision, *N.J.S.A.* 45:9–19.1, states, in pertinent part, that:

A person who in good faith and without malice provides to the State Board of Medical Examiners any information concerning any act by a physician or surgeon licensed by the board which the person has reasonable cause to believe involves misconduct that may be subject to disciplinary action by the board, or any information relating to such conduct requested by the board in the exercise of its statutory responsibilities or which may be required by statute, shall not be liable for civil damages in any cause of action arising out of the provision of such information or services.

[*N.J.S.A.* 45:9–19.1.]

Under that provision, immunity from civil damages does not depend upon a finding by the Board that disciplinary action is warranted. Immunity is afforded when the person providing information "has reasonable cause to believe ... [the physician or surgeon] may be subject to disciplinary action." *N.J.S.A.* 45:9–19.1. Even though the Board determined there was no warrant for disciplinary action, it observed and expressly noted that Feit's patient records did not meet the Board's recordkeeping rule.

The relevant administrative regulation, *N.J.A.C.* 8:38A–4.8(b)(2), directs that:

[a] carrier that terminates a contract based on a determination that the health care professional represents an imminent danger to the patient or the public health, safety and welfare shall report the determination to the appropriate State licensing board and reports to the State Board of Medical Examiners shall be subject to *N.J.S.A.* 45:9–19.5.

*N.J.A.C.* 8:38A–1.2 defines carriers to include "a[n] insurance company authorized to transact the business of insurance in this State...."

Based upon these legislative and administrative expressions, if Horizon made its report to the Board in good faith and without malice, it was properly granted immunity from civil damages. Moreover, as an insurance company in New Jersey, Horizon was obligated to report its termination of Feit's provider contract where it had determined the provider represented an imminent danger to patients or to the public health, safety and welfare.

Here, there is no evidence that defendant acted in bad faith, with malice or with reckless disregard for the truth. As early as October 1998, Horizon was concerned that Feit's medical records "lack[ed] documentation to support the complexity of the patient evaluation and management codes billed" and that while "patients [were] seen for a prolonged period of time there [was] no documented treatment plan." The following year, in December 1999, reviewers to whom Horizon had referred the medical records of two of Feit's patients opined that Feit's treatment of those patients was "not medically appropriate," based, in part, on insufficient documentation and no clearly stated treatment plan. More notably, the reviewers questioned the authenticity of the documentation for the patients because their medical records were "essentially identical."

After it conducted an audit toward the end of 2001, Horizon referred the files of five of Feit's patients to Miller and received a Peer Review Analysis from him. That Analysis reinforced Horizon's concerns regarding Feit and his practices. Miller noted that Feit's medical records did not support the medical necessity or

appropriateness of office visits for which they were billed, that he failed to adequately document reasonable treatment plans, and that his practice of prescribing several narcotic medications was not the industry standard.

Based, in large part, upon the Peer Review Analysis, in May 2002, Horizon's Review Subcommittee and its Credentialing Subcommittee recommended Feit's termination "as an imminent threat to the welfare & safety of [its] members." Feit was then informed that his provider contract was terminated immediately based on the Subcommittee's view that his continued participation presented an imminent danger to the health, safety and welfare of the plan's insured persons. Also, at that time, Horizon notified Feit that its decision to terminate him would be reported to the Board of Medical Examiners.

In considering plaintiffs' malicious prosecution arguments, the trial court noted:

The defendant makes motion to dismiss those counts alleging malicious prosecution and defamation and tortious interference based upon malice. Oh, I have to start out with *N.J.S.A.* 45:9–19.1 which grants immunity to those who in good faith and without malice provide information to the Board of Medical Examiners concerning an act of a physician.

Now, that's based upon the fact that the defendant referred this to the Board of Medical Examiners. They conducted a hearing. And the plaintiff is suing saying that's malicious prosecution and defamation. They are entitled to immunity if they acted in good faith and without malice.

In this case what they did before they terminated him and referred it to the Medical Board was they had a doctor review the records of the plaintiff. And he rendered a long report, which I reviewed[.]

. . . .

Dr. Miller finds a lot of stuff. For example, in almost every one it's the same of the five ones. Office visits billed were not medically appropriate. That local nerve blocks would be considered excessive beyond three months. Physical therapy is excessive beyond three months. Pain medications provided are excessive for pain management. And much of that is pretty much the same under each one, each of the patients. . . .

So, certainly I do not find any reasonable fact finder could ever find that to be maliciously done. I find it was based upon good faith. They got a report from a doctor. They made a decision. They referred it to the Medical Board as they're required to do. The case of *Feggans v. Billington,* [291 *N.J.Super.* 382, 677 *A.*2d

771 (App.Div.1996)] provides that doctors are public figures, and therefore, they must show malice in order for, to establish defamation.

I find there is absolutely no basis whatsoever for any fact finder to find malice in this case where this matter is referred to the New Jersey Board because they were required to and because there [was] certainly sufficient evidence from which they had a good faith reason to do what they did. Therefore, I am granting the motion to dismiss the counts of the complaint based upon malice.

We are satisfied that no genuine disputes as to material issues of fact existed and that the motion judge properly applied the law to dismiss plaintiffs' tort claims. *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995). Horizon gave Feit several opportunities to respond to the perceived irregularities and to dispel its suspicions. Several departments at various times reviewed Feit's case, including the UR Department, the SI Unit, the legal department, the Quality Case Review Subcommittee and finally, the Credentialing Subcommittee. These factors combine to demonstrate that Horizon acted in good faith and without malice in terminating Feit and in fulfilling the obligation to report the termination of Feit's provider contract. Thus, *N.J.S.A.* 45:9–19.1 immunizes Horizon from causes of action arising out of the termination of the provider agreement and the report of that termination to the Board.

■ We do not hold a similar view of the motion judge's consideration and disposition of plaintiffs' claims for the alleged breach of the provider agreement. The court found that plaintiffs' contract based claims were preempted by the Employee Retirement Income Security Act (ERISA). We do not agree. "Whether a state law claim is preempted by ERISA is a question of law which is reviewed de novo." *Finderne Mgmt. Co., Inc. v. Barrett,* 355 *N.J.Super.* 170, 185, 809 *A.*2d 842 (App.Div.2002), *certif. denied,* 177 *N.J.* 219, 827 *A.*2d 287 (2003) (citations omitted). Because we agree with Feit that he is not a plan participant, as defined in ERISA, nor a beneficiary, we conclude that plaintiffs' claims for payment for services rendered under the provider agreement are not preempted by ERISA. *Pascack Valley Hosp., Inc. v. Local 464A, UFCW Welfare Reimbursement Plan,* 388 *F.*3d 393, 398–99 (3d Cir.), *cert. denied,* — U.S. ——, 126 *S.Ct.*

336, 163 *L.Ed.*2d 48 (2005); *Blue Cross of Cal. v. Anesthesia Care Assocs. Med. Group, Inc.*, 187 *F.*3d 1045, 1050 (9th Cir.1999).

The issue of preemption may arise either under § 514(a) of ERISA, 29 *U.S.C.A.* § 1144(a), or under § 502, 29 *U.S.C.A.* § 1132(a). According to the Third Circuit Court of Appeals, preemption under § 514(a) is subject to the well-pleaded complaint rule, which would ordinarily bar the removal of an action to federal court where federal jurisdiction is not presented on the face of the plaintiff's complaint. *Pascack Valley Hosp., Inc., supra,* 388 *F.*3d at 398 n. 4, 399. *See also Caterpillar Inc. v. Williams,* 482 *U.S.* 386, 393 107 *S.Ct.* 2425, 2430, 96 *L.Ed.*2d 318, 327 (1987) (observing that "it is now settled law that a case may *not* be removed to federal court on the basis of a federal defense, including the defense of pre-emption, even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue").

Pursuant to § 514, ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . . ." 29 *U.S.C.A.* § 1144(a). "A rule of law relates to an ERISA plan if it is specifically designed to affect employee benefits plans, if it singles out such plans for special treatment, or if the rights or restrictions it creates are predicated on the existence of such a plan." *United Wire, Metal & Mach. Health & Welfare Fund v. Morristown Mem'l Hosp.*, 995 *F.*2d 1179, 1192 (3d Cir.), *cert. denied,* 510 *U.S.* 944, 114 *S.Ct.* 382, 126 *L.Ed.*2d 332 (1993) (footnotes omitted). The phrase "relate[s] to" should be "given its broad common-sense meaning." *Pilot Life Ins. Co. v. Dedeaux,* 481 *U.S.* 41, 47, 107 *S.Ct.* 1549, 1553, 95 *L.Ed.*2d 39, 48 (1987). "[A] state law 'relate[s] to' a benefit plan 'in the normal sense of the phrase, if it has a connection with or reference to such a plan.'" *Ibid.* (quoting *Metro. Life Ins. Co. v. Mass.*, 471 *U.S.* 724, 739, 105 *S.Ct.* 2380, 85 *L.Ed.*2d 728, 740 (1985)). However, "the bare fact that [a plan] may be consulted in the course of litigating a state-law claim does not require that the claim be

extinguished by ERISA's enforcement provision." *Blue Cross of Cal., supra,* 187 *F.*3d at 1051.

"Unlike the scope of § 502, which is jurisdictional and creates a basis for removal, § 514(a) merely governs the law that will apply to state law claims, regardless of whether the case is brought in state or federal court." *Pascack Valley Hosp., supra,* 388 *F.*3d at 398 n. 4. Our review of the pleadings in this case leads us to conclude that federal jurisdiction is neither presented on the face of the complaint nor in defendant's answer. Plaintiffs rely on their provider agreement, alleging that "[p]laintiff Feit has participated in the Provider Network ... [and] has routinely been paid by [defendant] ... for services rendered to patients who are insured by [defendant][.]"

It is clear that plaintiffs seek to recover fees for services rendered under the terms of the provider agreement, rather than as assignees of the rights of the patients. *See, e.g., Blue Cross of Cal., supra,* 187 *F.*3d at 1050 (holding that "the Providers' claims, which arise from the terms of their provider agreements ... are not claims for benefits under the terms of ERISA plans"). Plaintiffs are not plan participants or beneficiaries, and they do not allege that they are plan participants or beneficiaries. Because they are not plan participants or beneficiaries, ERISA preemption does not apply.

Unlike § 514(a), § 502(a) of ERISA provides complete preemption and preempts any state-law cause of action, even if pleaded in terms of state law, when the claim is, in reality, based on federal law. "A civil action may be brought—(1) by a participant or beneficiary—... (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]" 29 *U.S.C.A.* § 1132(a)(1)(B). To this end, "participant" is defined as:

> any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such

employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit.

[29 *U.S.C.A.* § 1002(7).]

Regarding the term, "participant," the United States Supreme Court has commented: "In our view, the term 'participant' is naturally read to mean either 'employees in, or reasonably expected to be in, currently covered employment,' or former employees who 'have . . . a reasonable expectation of returning to covered employment' or who have 'a colorable claim' to vested benefits." *Firestone Tire & Rubber Co. v. Bruch,* 489 *U.S.* 101, 117, 109 *S.Ct.* 948, 958, 103 *L.Ed.*2d 80, 97 (1989) (alterations in original) (internal citations omitted). "Beneficiary" is defined as "a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder." 29 *U.S.C.A.* § 1002(8). Plainly, plaintiffs do not come within the fair meaning of either a "participant" or a "beneficiary."

■ In granting summary judgment here, the trial judge apparently regarded the provider as a participant and beneficiary under ERISA. We agree with the Third Circuit Court of Appeals and the Ninth Circuit Court of Appeals, that a provider of services to plan participants or beneficiaries is not itself a participant or beneficiary. As such, it has no standing under ERISA to sue in its own right. Hence, contract-based claims brought in state court for compensation for services and treatments rendered to plan participants or beneficiaries are not preempted by ERISA.

Here, plaintiffs seek damages for Horizon's alleged failure to pay for treatments rendered to covered patients. On a motion for summary judgment, the facts and inferences must be viewed in the light most favorable to the party opposing summary judgment. So viewed, we are satisfied that plaintiffs are entitled to pursue their claimed right to payment for any services rendered before the effective date of the termination.

The dismissal of plaintiffs' tort-based claims is affirmed. The dismissal of the contract-based claims for payment for services

rendered to covered patients prior to termination of the provider agreement is reversed.

The matter is remanded for further proceedings.