**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4364-16T4

CAJOECO, LLC,
CAJOECO LLC PROFIT
SHARING TRUST, CAJOECO
LLC PROFIT SHARING PLAN,
JEST TEXTILE, INC., JEST
TEXTILES, INC. DEFINED
BENEFIT PLAN AND TRUST and
NORMAN MAIS, individually,
as Trustee, Administrator and
Beneficiary of Cajoeco LLC
Profit Sharing Trust and as Trustee,
Administrator and/or Beneficiary
of Jest Textile, Inc. Defined Benefit
Plan and Trust, CARMEN MAIS,
individually and as Trustee,
Administrator and Beneficiary of
Cajoeco LLC Profit Sharing Trust,

  Plaintiffs-Appellants,

v.

BENEFIT PLANS ADMINISTRATION
SERVICES, INC, BPAS ACTUARIAL
AND PENSION SERVICES, LLC[1],
CAI BENEFITS, INC.[2] and JEFFREY

---

[1]  Improperly named as Harbridge Consulting Group.

[2]  Improperly named as Consulting Actuaries International Inc.

SCHREIBER, E.A., individually and as
principal, agent and/or servant of Benefit
Plans Administration Services, Inc. as
principal, agent and/or servant of Consulting
Actuaries International Inc., and as principal,
agent and/or servant of Harbridge Consulting
Group,

     Defendants-Respondents.

_____

Argued December 11, 2018 – Decided April 25, 2019

Before Judges Rothstadt and Natali.

On appeal from Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-2928-16.

Christine Gillen argued the cause for appellants (Diktas Gillen, PC, attorneys; Christos J. Diktas, of counsel; Christine Gillen, on the briefs).

Jonathan B. Fellows (Bond, Schoeneck & King, PLLC) of the New York Bar, admitted pro hac vice, argued the cause for respondents (Ferro Labella & Zucker, LLC, and Jonathan B. Fellows, attorneys; Scott D. Jacobson and Jonathan B. Fellows, of counsel and on the brief).

PER CURIAM

In this appeal we are asked to determine whether a claim in state court for professional negligence against an actuary who drafted a company's retirement and related plans "relates to" an employee benefits plan under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 to 1461 (ERISA),

rendering this action preempted by federal law. For the reasons that follow, we conclude that the claim sufficiently related to ERISA so as to warrant the Law Division's dismissal of this matter on summary judgment based upon its preemption under federal law.

Plaintiffs, Norman and Carmen Mais, are spouses, former owners of plaintiff Jest Textiles, Inc. (Jest), the current owners of plaintiff Cajoeco, LLC (Cajoeco), and the administrators and beneficiaries of the two companies' retirement and profit sharing plans, plaintiffs Defined Benefit Plan and Trust (Jest Plan), Cajoeco LLC Profit Sharing Plan (Cajoeco Plan), and Cajoeco LLC Profit Sharing Trust (Cajoeco Trust). Plaintiffs appeal from the Law Division's May 11, 2017 order granting summary judgment in favor of defendant Jeffrey Schreiber, an actuary, and his co-defendants, Benefit Plans Administration Services, Inc. (BPAS), Consulting Actuaries International Inc. (CAI), and Harbridge Consulting Group (HCG), which are companies that Schreiber owned or worked for while providing actuarial services to plaintiffs.

The gist of plaintiffs' claim against defendants is that Schreiber did not warn Norman[3] that an investment he was making could result in a violation of

---

[3] We refer to the individual plaintiffs by their first names to avoid any confusion caused by their common last name.

ERISA and jeopardize his company's retirement and pension plans. The motion judge granted defendants' summary judgment motion and dismissed plaintiffs' complaint after she concluded that federal law preempted the claims.

On appeal, plaintiffs argue that the judge erred by extending "the scope of ERISA" to their claims against defendants, alleging professional negligence and breach of contract. We disagree.

We derive the following facts from the evidence submitted by the parties in support of and in opposition to the summary judgment motion, viewed in the light most favorable to plaintiffs as the parties who opposed the entry of summary judgment. Edan Ben Elazar v. Macrietta Cleaners, Inc., 230 N.J. 123, 135 (2017). Generally, the material facts are not disputed. Between 1970 and 2007, Norman was the controlling shareholder of Jest, a textile business. When Norman began planning for retirement in the early 1980s, he engaged Schreiber, an "enrolled actuary" under ERISA, for actuarial services. See 20 C.F.R. § 901.1(g).

At the time of his initial retention, Schreiber was a shareholder, officer, and employee of CAI, which, according to Schreiber, "provide[d] retirement plan administration and related services, including preparation of plan documents, recordkeeping and actuarial services." As Schreiber explained, the

actuarial services that he personally provided "relate[d] to principles of probability, such as life expectancy[] and compound interest." His engagement letter stated the following:

> [W]e will perform our services . . . in consideration of the applicable federal, foreign, state or local tax laws, regulations and associated interpretations. . . . [W]e will discuss with the Plan Sponsor any issues of which we are aware that we believe may subject the Plan Sponsor to penalties and discuss with Plan Sponsor possible courses of action to avoid the imposition of any penalty.

In 1991, Jest created and sponsored the Jest Plan, a defined benefit pension plan for its employees, including but not limited to Norman and Carmen. From its inception, Norman was an administrator and trustee of the Jest Plan. In order to comply with a provision of ERISA, 29 U.S.C. § 1023(a)(4), Jest was required to retain an "enrolled actuary" in order to determine on an annual basis that the plan had sufficient assets to make payments to participants going forward.

Schreiber, through CAI, began providing actuarial services to the Jest Plan in early 1995. Those services included preparation and filing of certain plan documents, but not managing the plan's assets, "selecting investments, or otherwise giving financial advice." That type of advice came from Merrill

Lynch, an investment firm that managed the plan's assets in accounts held at that brokerage.

It was undisputed that plaintiffs never alleged that Schreiber or any other defendant gave any plaintiff investment advice or acted "as investment management advisors to [any of the] plaintiffs."  Norman only relied upon "Schreiber [to] prepare[] the various documents that had to be filed with governmental entities or distributed to employees."  Those forms included the required Form 5500 that contained information about the plan and needed to be filed annually with the Internal Revenue Service (IRS).

It was also undisputed that Norman discussed making one investment with Schreiber, but not for his view as to whether it was a good investment.  Specifically, in 2003 or 2004, Norman wanted to invest in a friend's restaurant business known as Bensi.  According to Norman, before he committed to the investment, he contacted Schreiber

> and asked him whether it was permissible for [him] to use the money in the Merrill Lynch pension account to fund an investment in a restaurant business run by an acquaintance of [Norman's]. . . . Schreiber advised [Norman] that [he] could use that portion of the [Jest] Plan's money which was allocated to [Norman] but [he] could not use any part of the money allocated to other Jest employees when making the Bensi investment. Other than identifying this limitation, [Schreiber] gave [Norman] no other instruction or advice.

Schreiber confirmed that he never "offer[ed] Norman . . . any investment or financial advice . . . with respect to either Bensi or any other investment [because he was] an actuary, not an investment advisor." He also never "participate[d] in any of the conversations Norman . . . had with the representatives of Bensi who solicited him to make the investment, and [Schreiber] knew nothing about the investment other than that it was in a restaurant enterprise." However, Schreiber recalled discussing Norman's interest in the investment and telling him "[a]re you sure you want to invest your retirement money in restaurant partnerships? The investment would have a high risk and would not be liquid." Thereafter, Norman proceeded to invest Jest Plan assets in the Bensi restaurant chain. He and Schreiber never had any further discussions about the investment.

In 2006, Norman sold his interest in Jest and founded Cajoeco. The IRS later approved the termination of the Jest Plan and its assets were distributed to the beneficiaries, including, but not limited to, Norman and Carmen.

Once the Jest Plan was terminated, Norman and Carmen's assets from that plan were rolled over into the Cajoeco Plan and Trust, which became effective on January 1, 2007. Schreiber, while a member of CAI, drafted the legal documents necessary to form the Cajoeco Plan and Trust. Norman and Carmen

A-4364-16T4

were the sole administrators and participants of the Cajoeco Plan and co-trustees of the Cajoeco Trust. Unlike the Jest Plan, which was a defined benefit plan, the Cajoeco Plan was a defined contribution plan that did not require an "enrolled actuary" to prepare annual statements.

After the formation of the Cajoeco Plan and Trust, Norman continued to invest in Bensi. According to Norman, his last investment of Cajoeco Plan assets in Bensi occurred in 2008 or 2009, and he last invested his personal funds in Bensi restaurants in 2010.

Schreiber continued to provide services to plaintiffs through CAI until 2011, when that company sold certain assets to BPAS, formerly known as defendant HCG, and Schreiber became an employee of BPAS. BPAS provided services to Cajoeco, including preparing required tax filings that contained information provided by Bensi to its investors. According to Schreiber, neither CAI nor BPAS held or invested plan assets for plaintiffs nor "offer[ed] or provide[d] investment management services or financial advice to the Cajoeco Plan." According to plaintiffs, Schreiber provided them with "administrative, consulting, recordkeeping and tax preparation services through 2015, including annual preparation of the Form 5500" that relied upon information from Bensi relative to Norman's and Cajoeco's investment.

During 2015, Norman met with Gary Young, Esq., a tax attorney, after learning that Cajoeco's charter had been administratively terminated and he became concerned about how that action could impact the Cajoeco Plan. During the meeting, Young raised issues about the Bensi investment relating to whether it amounted to an impermissible investment under ERISA. Young explained that, "[u]pon evaluation of facts and circumstances surrounding the Bensi investments," he "concluded that the Cajoeco Plan Trustees deviated from the duties imposed upon them by ERISA, 29 U.S.C. § 1104. These deviations are known as 'operational failures' and constitute breaches of ERISA fiduciary responsibilities."

Young then submitted an anonymous inquiry to the IRS to see whether it "would grant approval to a voluntary correction procedure to correct the Cajoeco Plan's operational failures." The IRS denied his request in July 2015, at which point "it was clear for the first time that applicable taxes and penalties would be incurred and could not be avoided in this manner." However, it is undisputed that no such taxes or penalties were ever imposed.

Plaintiffs filed their complaint against defendants in this action in April 2016, asserting claims of negligence, breach of contract, breach of the implied covenant of good faith and fair dealing, and negligent infliction of emotional

distress. The complaint alleged that Schreiber "was primarily responsible for the delivery and supervision of the services, guidance, instruction and advice provided in connection with [the Jest Plan] including but not limited to matters of plan administration and compliance." The core allegation was that by "fail[ing] to identify" Norman's proposed investment of certain Jest Plan and later Cajoeco Plan assets in "the Bensi restaurant enterprise" as a "prohibited transaction under ERISA," defendants caused plaintiffs to suffer damages in the form of taxes and penalties that plaintiffs believe the IRS and or United States Department of Labor might assess.

Defendants filed an answer asserting federal preemption under ERISA as an affirmative defenses and a counterclaim for contribution or indemnification against Norman and Carmen based on their negligence as fiduciaries of the Jest Plan in "invest[ing] in the Bensi [r]estaurant." Plaintiffs responded to the counterclaim in an answer that denied defendants' allegations and asserted the affirmative defense of failure to state a claim. Thereafter, the court held a Ferriera[4] conference and determined that plaintiffs were not required to file an affidavit of merit to pursue their claims.

---

[4] Ferriera v. Rancocas Orthopedic, 178 N.J. 144 (2003).

Plaintiffs obtained an expert who rendered opinions about the deficiencies in Schreiber's performance as an actuary under ERISA. Plaintiffs' expert, Howard Phillips, an enrolled actuary, believed that Schreiber and his firms breached their professional responsibility to plaintiffs. According to Phillips, an actuary involved in a client's retirement planning and employee benefit services must provide advice beyond the basic mathematics involved with actuarial services. An actuary providing such advice needed to be versed in ERISA law, plan administration, and tax preparation. Phillips believed that Schreiber deviated from the generally accepted standards for actuaries involved with a client's retirement and employee benefit plans by not providing his clients with the information and advice they needed to carry out their duties under the plans that he created. According to Phillips, Schreiber breached his duties by not counseling his clients about the Cajoeco Plan documents he drafted or about their obligations as plan fiduciaries under ERISA, including the consequences of any failure to comply with their duties and or how to avoid any conduct that would cause such consequences. Schreiber also failed to properly advise Norman about transactions prohibited by ERISA or the possibility of tax consequences that could result from an improper investment.

Before the parties exchanged discovery, defendants filed a motion for summary judgment, arguing among other contentions that plaintiffs' claims were preempted by federal law. At an initial motion hearing on December 2, 2016, Judge Mary F. Thurber considered the parties' oral arguments and directed further briefing on the preemption issue. After those submissions were made, in a May 11, 2017 order, Judge Thurber dismissed plaintiffs' claims relating to Jest "on the basis that [Jest] Plan no longer exists" and granted defendants summary judgment on plaintiffs' remaining claims based on ERISA preemption grounds. She dismissed the claims without prejudice.

In the judge's cogent statement of reasons, she stated that the facts "compel[led] preemption" because "resolution of plaintiffs' claims will require a court to review in detail the terms of the plan, whether the actions of defendants with respect to the plan violated their obligations to plaintiffs, and whether the Bensi investment violated ERISA, as plaintiffs contend it did." Judge Thurber cited to our opinion in St. Peter's University Hospital v. N.J. Building Laborers Statewide Welfare Fund, 431 N.J. Super. 446 (App. Div. 2013), and the Third Circuit Court of Appeal's opinions in Kollman v. Hewitt Assocs., LLC, 487 F.3d 139 (3d Cir. 2007) and National Security Systems, Inc. v. Iola,

700 F.3d 65, 73 (3d Cir. 2012), concluding that preemption of plaintiffs' claims was supported by federal and state law. This appeal followed.[5]

In reviewing orders for summary judgment, we use the same standard as the trial court. Globe Motor Co. v. Igdalev, 225 N.J. 469, 479 (2016). We decide first whether there was any genuine issue of material fact; if there was not, we then decide whether the trial court's ruling on the law was correct. Walker v. Atl. Chrysler Plymouth, Inc., 216 N.J. Super. 255, 258 (App. Div. 1987). "In so doing, we accord no deference to the motion judge's conclusions on issues of law, which we review de novo." St. Peter's Univ. Hosp., 431 N.J. Super. at 453-54 (citations omitted). "Specifically, the issue of '[w]hether a state law claim is preempted by ERISA is a question of law which is reviewed de novo.'" Id. at 454 (quoting Feit v. Horizon Blue Cross & Blue Shield of N.J., 385 N.J. Super. 470, 482 (App. Div. 2006)); see also In re Reglan Litig., 226 N.J. 315, 327-28 (2016).

We begin our de novo review by turning to the federal law at issue. "ERISA is a 'comprehensive regulatory scheme' enacted by Congress 'to protect participants of employee benefit plans and their beneficiaries from the abuses

---

[5] After plaintiffs appealed, on September 27, 2017, Cajoeco, Norman, and Carmen filed a complaint in the United States District Court for the District of New Jersey against Schreiber, BPAS, and CAI, asserting claims for the breaches of fiduciary duty associated with the Bensi investments.

which previously existed in many retirement plans.' [It] governs private employee benefit plans, and sets forth requirements, uniform standards, fiduciary responsibilities, and penalties." St. Peter's Univ. Hosp., 431 N.J. Super. at 454 (App. Div. 2013) (citations omitted); see also Gobeille v. Liberty Mut. Ins. Co., 136 S. Ct. 936, 943-44 (2016).

Whether ERISA preempts a state court action against an actuary performing services for an employer sponsored plan requires an understanding of when preemption applies. "The doctrine of federal preemption finds its source in the Supremacy Clause of the United States Constitution. . . . A state law that conflicts with a federal statute is naturally preempted." Reglan Litig., 226 N.J. at 328 (citing Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 372 (2000)). "When Congress legislates in a field where states have traditionally exercised their 'historic police powers,' the preemption inquiry begins with the 'assumption' that Congress did not intend to supersede a state statute 'unless that was [Congress's] clear and manifest purpose.'" Ibid. (alteration in original) (quoting Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996)). "Accordingly, '[t]he purpose of Congress is the ultimate touchstone' of [preemption] analysis." Cipollone v. Liggett Grp., Inc., 505 U.S. 504, 516 (1992) (first alteration in original) (quoting Malone v. White Motor Corp., 435 U.S. 497, 504(1978)).

"[Preemption] may be either expressed or implied." Gade v. Nat'l Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 98 (1992). "Express preemption is determined from an examination of the explicit language used by Congress." Gonzalez v. Ideal Tile Importing Co., 184 N.J. 415, 419 (2005) (citing Jones v. Rath Packing Co., Inc., 430 U.S. 519, 525 (1977)). "A federal enactment expressly preempts state law if it contains language so requiring." Bruesewitz v. Wyeth Inc., 561 F.3d 233, 239 (3d Cir. 2009).

ERISA contains a requirement for preemption. See 29 U.S.C. § 1144 (a). "ERISA . . . aims 'to provide a uniform regulatory regime over employee benefit plans' in order to ease administrative burdens and reduce employers' costs." Iola, 700 F. 3d at 82 (quoting Aetna Health Inc. v. Davila, 542 U.S. 200, 208 (2004)). "To ensure that plan regulation resides exclusively in the federal domain, Congress inserted in . . . [ERISA] an expansive preemption provision . . . ." Ibid. For that reason, ERISA contains an "extraordinary [preemptive] power" with a broad scope. Id. at 83 (quoting Metro. Life Ins. Co. v. Taylor, 481 U.S. 58, 65 (1987)).

In St. Peter's Univ. Hosp., we considered under the facts of that case a claim that ERISA preempted state law claims of breach of contract claim and

unjust enrichment and concluded the claims were preempted.  In doing so, we explained preemption under ERISA.  We stated:

> There are two types of preemption established under ERISA: complete preemption under Section 502(a), which is inapplicable here, and express preemption under Section 514(a), which preempts state law claims that "relate to" an ERISA plan.  Specifically, the statute pertaining to express preemption states, in pertinent part, that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . . ."
>
> Courts have given the phrase "relate to" a broad commonsense meaning.  A "'law "relates to" an employee benefit plan . . . if it has a connection with or reference to such a plan.'"  "ERISA preempts state laws even when those laws are not specifically designed to affect ERISA-covered plans or affects them indirectly."
>
> However, "although ERISA preemption is 'clearly expansive,' to interpret the language to its furthest extent would render the reach of the provision limitless."  Therefore, "[p]reemption does not occur 'if the state law has only a tenuous, remote, or peripheral connection with covered plans, as is the case with many laws of general applicability.'"
>
> A state law claim relates to an employee benefit plan if "the existence of an ERISA plan [is] a critical factor in establishing liability" and "the trial court's inquiry would be directed to the plan[.]"
>
> [St. Peter's Univ. Hosp., 431 N.J. Super. at 454-56 (alterations in original) (footnote and citations omitted).]

In St. Peter's Univ. Hosp., we cited to Kollman, which addressed

> a professional malpractice claim, based on the failure of a pension plan administrator to provide correct pension amounts[ that the Third Circuit found] was expressly preempted because it went to "the essence of the function of an ERISA plan—the calculation and payment of the benefit due to a plan participant."
>
> [Id. at 456 (quoting Kollman, 487 F.3d at 150).]

In Kollman, the Third Circuit noted the danger of allowing state claims to dictate when professionals employed as agents of employers, "who undertake and perform administrative duties for and on behalf of ERISA plans," are negligent in the performance of their duties. Kollman, 487 F.3d at 148. As the Third Circuit stated, "[t]o subject such companies to the differing state court interpretations of the tort of professional malpractice would create obstacles to the uniformity of plan administration that was and is one of ERISA's goals." Ibid.

We conclude the logic expressed in Kollman applies to the present matter. As Judge Thurber found, the facts here "compel preemption" because the consideration of plaintiffs' ERISA plans and Schreiber's performance of his duties as an "enrolled actuary" under ERISA are "critical" to the resolution of plaintiffs' claims. 1975 Salaried Ret. Plan for Eligible Emps. of Crucible, Inc. v. Nobers, 968 F.2d 401, 406 (3d Cir. 1993) ("the existence of an ERISA plan

17

[is] a critical factor in establishing liability" when the claim depends on the existence of an ERISA plan, which can be shown by establishing that "if there were no plan, there would have been no cause of action").

At the outset, we note that unlike other professionals who may render advice and services to employers or plan fiduciaries, see Finderne Mgmt. Co., Inc. v. Barrett, 355 N.J. Super. 170 (App. Div. 2002), Schreiber's services as an "enrolled actuary" were expressly defined and regulated by ERISA. See 20 C.F.R. § 901.1. In order to determine whether Schreiber failed to perform his duties under those regulations, a court must necessarily consider the provisions of ERISA and its regulations.

Similarly, whether Schreiber rendered proper advice about the Bensi investment first requires a determination under ERISA whether the alleged advice is part of an enrolled actuary's duties and second, whether such investments are prohibited by ERISA, especially where, as here, neither the IRS nor any other federal agency ever notified plaintiffs that the federal government was imposing any penalties or taxes on any of them as result of the Bensi investment. Cf. Finderne, 355 N.J. Super. at 184 (where "the IRS notified Finderne that it was disallowing the deductions it had taken for its contributions to" the ERISA plan). Plaintiffs here "would be required to establish

18

[Schreiber's] liability for the ERISA violations in order to prove its state-law claims." Travelers Cas. & Sur. Co. of Am. v. IADA Servs., Inc., 497 F.3d 862, 867 (8th Cir. 2007).

Also, plaintiffs' allegation that Schreiber's advice caused an "operational defect" for which plaintiffs should be compensated, requires an analysis of ERISA regulations. Under federal tax regulations, the term "[o]perational [f]ailure" is a term of art that "means any failure [(other than an Employer Eligibility Failure)] that adversely affects the qualification of a plan. . . . that arises solely from the failure to follow plan provisions." Rev. Proc. 2018-52, 2018-42 I.R.B. 611.

Preemption here was therefore warranted and necessary to ensure that ERISA's goal of uniformity is met. "Requiring ERISA administrators [and actuaries] to master the relevant laws of [fifty s]tates and to contend with litigation would undermine the congressional goal of 'minimiz[ing] the administrative and financial burden[s]' on plan administrators—burdens ultimately borne by the beneficiaries." Gobeille, 136 S. Ct. at 944 (third and fourth alterations in original) (quoting Egelhoff v. Egelhoff, 532 U.S. 141, 149-50 (2001)). Judge Thurber, therefore, correctly dismissed plaintiffs' complaint.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4364-16T4